UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| LAUREN HAIDON,<br>    Plaintiff, | No. 3:19-cv-119 (SRU) |
| v. | |
| BRENDAN DANAHER,<br>    Defendant. | |

**ORDER ON MOTION FOR JUDGMENT AS A MATTER OF LAW, FOR A NEW TRIAL, OR FOR REMITTITUR**

Lauren Haidon brought this action against Brendan Danaher, a police officer with the Bloomfield, Connecticut Police Department. Haidon alleged that Danaher falsely arrested and maliciously prosecuted her for felony custodial interference. After a trial in December 2023, a jury found Danaher liable to Haidon for false arrest in violation of Connecticut law and malicious prosecution in violation of the Fourth Amendment to the U.S. Constitution. The jury awarded Haidon $1.5 million in compensatory damages. *See* Verdict Form, Doc. No. 220.

Before the Court now is Danaher's post-trial motion for judgment as a matter of law, for a new trial, or for remittitur, doc. no. 239.

**I.      Background**

This case was principally about whether the affidavit Officer Brendan Danaher submitted in support of an application for a warrant for Lauren Haidon's arrest contained misrepresentations and omissions that were material to the issue of probable cause to believe that she had committed the crime of felony custodial interference.

The jury could reasonably have found the following facts. Pursuant to a separation agreement between herself and her ex-husband Matthew Couloute that was signed on April 23,

2015, Haidon shared joint custody of her minor daughter (hereinafter referred to as "the child") with Couloute.[1] *See* Separation Agreement, Trial Ex. 22, at ¶ 6. Haidon and Couloute also agreed not to permanently take the child out of Connecticut without prior written approval of the other party or a court order. *Id*.

In October of 2016, Haidon went with the child to live with Haidon's parents in West Seneca, New York. At the time, Couloute had failed to pay child support to Haidon and relocated to Georgia, leaving Haidon and the child without any means of support. Shortly thereafter, communications between Haidon and Couloute became increasingly hostile. In an email exchange dated October 14, 2016, Haidon told Couloute that he had "left [her and the child] homeless," and Couloute responded "[y]ou're going to Buffalo, go. Just give me time with my daughter." Trial Ex. 2, at 56. Haidon explained that she intended to remain at her parent's house in West Seneca temporarily, to "get [herself] together and get a job and rebuild [her] life." *See* Trial Tr., Doc. No. 246, at 733:20-25. Shortly after moving, on November 4, 2016, Haidon filed a notice with the Hartford Superior Court titled "Appearance and Change of Address," listing her address as her parent's home in West Seneca. *See* Trial Ex. 16.

Throughout the fall of 2016, after Haidon had moved to New York, Haidon and Couloute's communications continued to deteriorate. Haidon then initiated court proceedings in New York related to the custody of the child. On January 9, 2017, Haidon filed custody and family offense petitions in the Erie County, New York Family Court. *See* Trial Exs. 56-57. Those petitions alleged that Coulotte had emotionally and physically abused Haidon and had failed to support Haidon and the child. *Id.* The petitions also made reference to prior orders of custody issued in Connecticut, and asked the Erie County Family Court to exercise temporary,

---

[1] To protect her identity, I will not use the first name of Haidon and Couloute's daughter.

emergency jurisdiction over the case. *Id.* On that same date, January 9th, the Erie County Family Court issued an order ("the Erie County Order") temporarily suspending Couloute's access to the child and a notice to Couloute and Haidon to appear in court on January 20, 2017. *See* Trial Ex. 5.

On the evening of January 11, 2017, only two days after Couloute's access to the child had been suspended by the Erie County court, Couloute appeared at the Bloomfield Police Headquarters. Couloute complained to Danaher that Haidon had taken the child to New York and that he had been unable to see her since October of 2016. *See* Case/Incident Report, Trial Ex. 2, at ¶¶ 3-4. After reviewing the separation agreement, making one phone call each to the West Seneca, New York Police Department and to Haidon, and reviewing approximately a dozen emails forwarded to him by Haidon and Couloute, Danaher made the decision that same evening to apply for a warrant for Haidon's arrest on the charge of Custodial Interference in the First Degree, in violation of Conn. Gen. Stat. § 53a-97, a class D felony. *Id.* at ¶¶ 5-8.

The following day, Danaher prepared an application for an arrest warrant, including a signed affidavit detailing the facts of the case and his investigation. *See* Trial Ex. 2, at 21-23. On the basis of that affidavit, then-Superior Court Judge Omar Williams signed a warrant for Haidon's arrest on January 24, 2017. *See* Trial Ex. 7. An extradition request based on the arrest warrant was granted on February 8, 2017. *See* Trial Ex. 2, at 9. During a March 1, 2017 custody hearing in family court in New York, Haidon was handcuffed due to the outstanding warrant for her arrest. *See id.* at 15. She later turned herself in to the Bloomfield Police Department on March 6, 2017. *See id.* at 16. The charges against Haidon were dismissed on August 17, 2017, *see* Trial Ex. 53, but resulted in Haidon losing physical custody of the child for over a year. *See* Trial Ex. 69. As of the date of trial, Haidon again resided in New York with the child.

Haidon filed this lawsuit on January 24, 2019. *See* Compl., Doc. No. 1. At a summary judgment hearing on February 15, 2023, I granted partial summary judgment to Danaher on qualified immunity and other grounds. *See* Doc. Nos. 126, 129. I also denied Haidon's cross-motion for summary judgment in her favor. *Id.* The case proceeded to trial in December 2023 on the remaining claims and defenses: Haidon's claims for false arrest under state law and malicious prosecution under federal law, pursuant to 42 U.S.C. § 1983, and Danaher's defense of qualified immunity to the federal claim. After an approximately two-week-long trial, a jury found Danaher liable to Haidon on both of her claims. *See* Verdict Form, Doc. No. 220.

The instant motion for judgment as a matter of law, for a new trial, or for conditional remittitur was filed on January 11, 2024. *See* Doc. No. 239.[2]

## II.     Standards of Review

### A.     Rule 50: Motion Judgment as a Matter of Law

Federal Rule of Civil Procedure 50(b) allows for the entry of judgment as a matter of law if a jury returns a verdict for which there is no legally sufficient evidentiary basis. *See* Fed. R. Civ. P. 50. The standard under Rule 50 is the same as that for summary judgment. A court may not grant a Rule 50 motion unless "the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable [persons] could have reached." *This Is Me, Inc. v. Taylor*, 157 F.3d 139, 142 (2d Cir. 1998) (citation and internal quotation marks omitted). Thus,

---

[2] Danaher filed his motion for judgment as a matter of law, for a new trial, or for remittitur on January 11, 2024, along with a memorandum of law. *See* Doc. No. 239. Then, on February 24, 2024, he filed a corrected memorandum in support of that motion, which contained non-substantive corrections to errors in his original memorandum. *See* Doc. No. 262. Throughout this Order, when citing to Danaher's memorandum in support of his motion, I will cite to his corrected memorandum of law, doc. no. 262.

in deciding such a motion, "the court must give deference to all credibility determinations and

reasonable inferences of the jury . . . and it may not itself weigh the credibility of the witnesses

or consider the weight of the evidence." *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136

F.3d 276, 289 (2d Cir. 1998) (citations omitted).

On a motion for judgment as a matter of law, a court is "required to consider the evidence

in the light most favorable to the party against whom the motion was made and to give that party

the benefit of all reasonable inferences that the jury might have drawn in his favor from the

evidence." *Ojeda v. Metro. Transportation Auth.*, 41 F.4th 56, 63 (2d Cir. 2022) (quoting *Black

v. Finantra Cap., Inc.*, 418 F.3d 203, 208-09 (2d Cir. 2005)). In short, the court cannot

"substitute its judgment for that of the jury." *LeBlanc-Sternberg v. Fletcher*, 67 F.3d 412, 429

(2d Cir. 1995) (citations omitted). Rather, judgment as a matter of law may only be granted if:

> (1) there is such a complete absence of evidence supporting the verdict that the jury's
> findings could only have been the result of sheer surmise and conjecture, or
> (2) there is such an overwhelming amount of evidence in favor of the movant that
> reasonable and fair-minded persons could not arrive at a verdict against it.

*Galdieri-Ambrosini*, 136 F.3d at 289 (quoting *Cruz v. Local Union No. 3 of the Int'l Bhd. of Elec.

Workers*, 34 F.3d 1148, 1154 (2d Cir. 1994)) (internal quotation marks omitted); *see

also Luciano v. Olsten Corp.*, 110 F.3d 210, 214 (2d Cir. 1997).

In addition to arguing that he is entitled to judgment as a matter of law because there was

an absence of evidence supporting the jury's verdict, Danaher also argues that he is entitled to

judgment as a matter of law on qualified immunity grounds. "Qualified immunity protects

officials from damages liability if their conduct does not violate clearly established statutory or

constitutional rights of which a reasonable person would have known, or if it was objectively

reasonable for the officer to believe that his actions were lawful at the time of the challenged

act." *Dorceant v. Aquino*, 2018 WL 3869891, at *2 (E.D.N.Y. Aug. 15, 2018) (quoting *Mullenix*

5

*v. Luna*, 577 U.S. 7, 11 (2015); *Myers v. Patterson*, 819 F.3d 625, 632 (2d Cir. 2016)) (cleaned up).

### B. Rule 59: Motion for a New Trial

Federal Rule of Civil Procedure 59 provides that "[t]he court may, on motion, grant a new trial on all or some of the issues—and to any party . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A).

When a party moving for a new trial does so "on the grounds that the verdict was against the weight of the evidence," the court can "weigh the evidence" and is not required to "view it in the light most favorable to the verdict winner," *DLC Management Corp. v. Town of Hyde Park*, 163 F.3d 124, 133-34 (2d Cir. 1998) (cleaned up). For that reason, the Rule 59(a) standard for granting a new trial is "less stringent" than the Rule 50 standard for judgment as a matter of law. Relatedly, a new trial may be granted even if there is substantial evidence supporting the jury's verdict. *Mugavero v. Arms Acres, Inc.*, 680 F. Supp. 2d 544, 558 (S.D.N.Y. 2010). However, the standard is still "relatively high;" a court should only grant a new trial if "the court is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice." *Starr Indem. & Liab. Co. v. Am. Claims Mgmt., Inc.*, 131 F. Supp. 3d 185, 188 (S.D.N.Y. 2015), *Kosmynka v. Polaris Indus.*, 462 F.3d 74, 82 (2d Cir. 2006).

A court may also grant a new trial because of substantial errors in the admission or exclusion of evidence, *see Stampf v. Long Island R.R. Co.,* 761 F.3d 192, 202 (2d Cir. 2014), prejudicial misconduct from counsel, *see Pappas v. Middle Earth Condo. Ass'n,* 963 F.2d 534, 540 (2d Cir. 1992), errors in jury instructions, *see United States v. Kozeny,* 667 F.3d 122, 130 (2d Cir. 2011), or errors in verdict sheets, *see Armstrong ex rel. Armstrong v. Brookdale Univ. Hosp.*

*& Med. Ctr.,* 425 F.3d 126, 136 (2d Cir. 2005). However, to warrant a new trial, each of those

errors or instances of misconduct, even if proven, must have been "clearly prejudicial to the

outcome of the trial," considered in light of the record as a whole. *Marcic v. Reinauer Transp.*

*Cos.*, 397 F.3d 120, 124 (2d Cir. 2005).

   C.   <u>Remittitur</u>

   A trial judge's discretion to grant a new trial "includes overturning verdicts for

excessiveness and ordering a new trial without qualification, or conditioned on the verdict

winner's refusal to agree to a reduction (remittitur)." *Kirsch v. Fleet St., Ltd.*, 148 F.3d 149, 165

(2d Cir. 1998) (quoting *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 433 (1996)).

"Remittitur is the process by which a court compels a plaintiff to choose between reduction of an

excessive verdict and a new trial." *Stampf v. Long Island R. Co.*, 761 F.3d 192, 204 (2d Cir.

2014) (quoting *Shu–Tao Lin v. McDonnell Douglas Corp.*, 742 F.2d 45, 49 (2d Cir. 1984)).

Remittitur is appropriate either:

>    (1) where the court can identify an error that caused the jury to include in the verdict a
>    quantifiable amount that should be stricken, [or] (2) more generally, where the award is
>    intrinsically excessive in the sense of being greater than the amount a reasonable jury
>    could have awarded, although the surplus cannot be ascribed to a particular, quantifiable
>    error.

*Anderson Grp., LLC v. City of Saratoga Springs*, 805 F.3d 34, 51 (2d Cir. 2015) (quoting *Kirsch*,

148 F.3d at 165).


III.   **Discussion**

   A.   <u>Motion for Judgment as a Matter of Law</u>

   Danaher makes two arguments in support of his motion for judgment as a matter of law: (1)

that no reasonable jury could have found, based upon the evidence presented at trial, that the

elements of Haidon's claims were met, and (2) that Danaher is entitled to qualified immunity. *See* Doc. No. 262, at 32-49. I will address each of those arguments in turn.

### 1. *Absence of Evidence Supporting the Jury's Verdict*

First, Danaher argues that he is entitled to judgment as a matter of law because no reasonable jury could have concluded that Haidon satisfied her burden of proving various elements of her claims. *See* Fed. R. Civ. P. 50 (allowing entry of judgment as a matter of law after trial if "a reasonable jury would not have a legally sufficient evidentiary basis" to support the verdict).

Haidon brought two claims: a Section 1983 malicious prosecution claim, and a state law false arrest claim. The elements of each claim are similar. "In order to prevail on a § 1983 claim against a state actor for malicious prosecution, a plaintiff must show a violation of his rights under the Fourth Amendment, and establish the elements of a malicious prosecution claim under state law." *Fulton v. Robinson*, 289 F.3d 188, 195 (2d Cir. 2002). *See also Washington v. Cnty. of Rockland,* 373 F.3d 310, 316 (2d Cir. 2004) ("[T]o sustain a § 1983 malicious prosecution claim, there must be a seizure or other 'perversion of proper legal procedures' implicating the claimant's personal liberty and privacy interests under the Fourth Amendment.") (quoting *Singer v. Fulton County Sheriff*, 63 F.3d 110, 117 (2d Cir. 1995)). The elements of a malicious prosecution claim under Connecticut law are that: "(1) the defendant initiated or continued criminal proceedings against the plaintiff; (2) the criminal proceeding terminated in favor of the plaintiff; (3) 'the defendant acted without probable cause'; and (4) 'the defendant acted with malice.'" *Roberts v. Babkiewicz*, 582 F.3d 418, 420 (2d Cir. 2009) (quoting *McHale v. W.B.S. Corp.*, 187 Conn. 444, 447 (1982)). To prevail on a claim of false arrest under Connecticut law, a plaintiff must establish that "(1) the defendant intentionally arrested him or had him arrested; (2)

the plaintiff was aware of the arrest; (3) there was no consent to the arrest; and (4) the arrest was

not supported by probable cause." *Shattuck v. Town of Stratford*, 233 F. Supp. 2d 301, 306

(D. Conn. 2002).

In his memorandum of law in support of his motion, Danaher argued Haidon did not

prove at trial that she suffered a Fourth Amendment deprivation of liberty or that the charges

against her terminated in her favor. *See* Doc. No. 262, at 33, 41. However, in a letter to the Court

after argument on his motion, Danaher's counsel informed the Court that he would not pursue

those arguments. *See* Doc. No. 276, at 2-3.[3] The remaining elements that Danaher argues no

reasonable jury could have found were satisfied are (1) the absence of probable cause, an

element of both of Haidon's claims, and (2) malice, an element of Haidon's malicious

prosecution claim. *Id*. I will address each of those arguments in turn.

   a.   Absence of Probable Cause

First, and most fundamentally, Danaher argues that no reasonable jury could have found

that Danaher lacked probable cause to arrest Haidon. *See* Doc. No. 262, at 33-40. The existence

of probable cause is a complete defense to both of Haidon's claims. *Williams v. Town of*

*Greenburgh*, 535 F.3d 71, 78-79 (2d Cir. 2008). In this case, Haidon was arrested pursuant to a

warrant signed by a Connecticut judge, creating a presumption that her arrest was supported by

probable cause. *Golino v. City of New Haven*, 950 F.2d 864, 870 (2d Cir. 1991). To overcome

that presumption, Haidon had to prove at trial that Danaher knowingly and intentionally, or with

---

[3] I note that, even if Danaher pursued his argument that the "favorable termination" element of
Haidon's claims had not been proven, that argument would have failed because Haidon's
criminal defense attorney, Rachel Baird, testified that despite the State of Connecticut's offer to
*nolle* the charges against Haidon, Baird rejected the *nolle* and her motion to dismiss the charges
was granted. *See* Trial Tr., Doc. No. 248, at 1105:14-17. Danaher incorrectly characterizes the
termination of the charges as pursuant to the state's offer of a *nolle*, "not on the merits," and
"without prejudice." *See* Reply, Doc. No. 260, at 6-7.

reckless disregard for the truth, made a false statement or material omission in the arrest warrant affidavit submitted to the judge, and that the false statement or material omission was necessary to judge's determination of probable cause. *Soares v. State of Conn.*, 8 F.3d 917, 920 (2d Cir. 1993) (citing *Golino*, 950 F.2d at 870-71, and *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978)); *see also Ganek v. Leibowitz,* 874 F.3d 73, 81 (2d Cir. 2017).

In assessing probable cause, courts look to the totality of the circumstances and examine "plainly exculpatory evidence alongside inculpatory evidence to ensure the court has a full sense of the evidence that led the officer to believe that there was probable cause to make an arrest," or, in this situation, to seek a warrant for the plaintiff's arrest. *Stansbury v. Wertman,* 721 F.3d 84, 93 (2d Cir. 2013). Where there are allegations of misstatements or omissions in an affidavit, a court must imagine "a hypothetical corrected affidavit, produced by deleting any alleged misstatements from the original warrant affidavit and adding to it any relevant omitted information." *Ganek,* 874 F.3d at 82. "If probable cause is lacking after such correction, then the false statement [or material omission] was 'necessary' to secure issuance of the warrant." *Id. See also Soares,* 8 F.3d at 920 (when determining whether false or omitted information was material to the probable cause determination, "a court should put aside allegedly false material, supply any omitted information, and then determine whether the contents of the 'corrected affidavit' would have supported a finding of probable cause.").

Danaher's original arrest warrant affidavit was admitted into evidence at trial. *See* Trial Ex. 8. Much, if not most, of the evidence Haidon presented at trial was offered to prove that various statements in the affidavit were false and various pieces of information were omitted. *See* Opp'n, Doc. No. 258-10, at 11-27. Ordinarily, as described above, the first step of the "corrected warrant" analysis would be to determine, based on the evidence presented at trial, which pieces

of information a reasonable jury could have concluded were actually misstated or omitted, and then correcting the affidavit. However, Danaher concedes that, at a minimum, the following information was misstated in or omitted from the affidavit:

Misstatements:

1. Couloute had obtained a signed order of contempt against Haidon for violating the separation agreement. *See* Trial Ex. 8, at ¶ 5.

2. The Erie County, New York Family Court order granting temporary custody to Haidon did not supersede the Connecticut custody order. *See* Trial Ex. 8, at ¶ 7.

Material Omissions:

1. Couloute had sent an email to Haidon saying "Go to Buffalo, go, just give me time with my daughter."

2. Couloute had relocated to Georgia and was not living in Connecticut at the time he made his complaint to Danaher.

3. The Erie County, New York Family Court had issued an emergency order temporarily banning Couloute from having access to or visitation with the child at the time he filed his complaint.

*See* Doc. No. 262, at 35-39. Danaher's argument is that, after correcting the affidavit by deleting the misstatements and adding the omitted information, "[t]he corrected warrant provides probable cause pursuant to both subsection 1 and 3 of the [custodial interference] statute." *Id.* at 40. That argument is unconvincing. Even with only the minimal corrections to the affidavit that are uncontested, a reasonable jury could easily have concluded that probable cause was lacking and therefore that Danaher's misstatements and omissions were necessary to secure the issuance of the warrant.

11

Danaher's affidavit sought an arrest warrant for Haidon on the charge of Custodial

Interference in the First Degree. Connecticut's Custodial Interference statute states:

> (a) A person is guilty of custodial interference in the first degree when he commits custodial interference in the second degree as provided in section 53a-98: (1) Under circumstances which expose the child or person taken or enticed from lawful custody or the child held after a request by the lawful custodian for his return to a risk that his safety will be endangered or his health materially impaired; or (2) by taking, enticing or detaining the child or person out of this state.

Conn. Gen. Stat. § 53a-97. Section 53a-98, referenced in the above excerpt, states:

> (a) A person is guilty of custodial interference in the second degree when: (1) Being a relative of a child who is less than sixteen years old and intending to hold such child permanently or for a protracted period and knowing that he has no legal right to do so, he takes or entices such child from his lawful custodian; (2) knowing that he has no legal right to do so, he takes or entices from lawful custody any incompetent person or any person entrusted by authority of law to the custody of another person or institution; or (3) knowing that he has no legal right to do so, he holds, keeps or otherwise refuses to return a child who is less than sixteen years old to such child's lawful custodian after a request by such custodian for the return of such child.

Conn. Gen. Stat. § 53a-98. Therefore, for probable cause to have existed for Haidon's arrest,

there must have been probable cause to believe that: (1) Couloute was a lawful custodian of the

child; and (2) Haidon knew she had no legal right to take the child out of Connecticut and keep

her from Couloute.

With the minimal corrections described above, a hypothetical corrected affidavit, in

essence, would include the only following information: there was a separation agreement

between Haidon and Couloute stating that neither can remove the child from Connecticut

without the written permission of the other; Couloute at some point relocated to Georgia from

Connecticut; Couloute emailed Haidon "you're going to Buffalo, go;" Haidon removed the child

from Connecticut and refused to disclose her location to Couloute or allow Couloute access to

her; and Haidon later obtained an emergency order from the Erie County Family Court

suspending Couloute's access to the child. *See* Doc. No. 262, at 35-39. Those facts paint a very different picture of the facts than Danaher's original affidavit did.

A reasonable jury certainly could conclude, on the basis of that corrected affidavit, that there was an absence of probable cause to arrest Haidon for Custodial Interference in the First Degree both because Couloute was not a lawful custodian for at least some relevant period of time and because the "you're going to Buffalo, go" email undermines Haidon's *mens rea*. Rule 50's demanding standard for judgment as a matter of law—requiring either a "complete absence of evidence" that probable cause was lacking, or an "overwhelming amount of evidence" in favor of probable cause existing—simply cannot be satisfied in light of the corrected affidavit agreed to by Danaher.

Moreover, the fifth paragraph of Danaher's affidavit in support of his arrest warrant application stated that:

> . . . COULOUTE stated since HAIDON has been in New York State she was able to achieve temporary custody of [the child] in New York however in Connecticut COULOUTE was able to file for contempt (which was granted) as HAIDON disregarded the child custody agreement. The signed order, which I viewed, clearly states that HAIDON needed the Connecticut courts permission or COULOUTE's written permission. . . .

*See* Trial Ex. 8, at ¶ 5. Though Danaher seemingly admits that the first sentence of that paragraph was a misstatement and must be deleted when correcting the affidavit, he would leave the second sentence untouched. *See* Doc. No. 262, at 37. Though the meaning of the second sentence is perhaps ambiguous, the most natural reading of it is that the phrase "[t]he signed order, which I viewed" refers to Couloute's motion for contempt which "was granted" as set forth in the prior sentence. No other order is mentioned in the affidavit. But it is undisputed that there was no such signed contempt order: none is included in Danaher's investigative file, and he admitted on the record at trial that he can't recall ever receiving from Couloute or otherwise viewing a signed

order from any Connecticut judge holding Haidon in contempt for violating the separation

agreement. *See* Trial Tr., Doc. No. 244, at 187:1-189:15. A reasonable jury therefore could have

concluded that the second sentence of paragraph five of the affidavit was also a misstatement,

and that statement certainly would have been material to a judge's determination of probable

cause. Indeed, the existence of a signed order of contempt against Haidon for the same actions

Danaher described in his affidavit may have been the *most* material fact that assured Judge

Williams that there was probable cause to believe Haidon had committed the crime of custodial

interference.

On a motion for judgment as a matter of law, I must give Haidon the benefit of all

reasonable inferences that the jury could have drawn in her favor. Doing that, I conclude that a

reasonable jury could have inferred the "you're going to Buffalo, go" email, the Erie County

Order suspending Couloute's custody, and the absence of any signed order of contempt against

Haidon undermined a finding of probable cause for two essential elements of the charged crime:

that Couloute was a lawful custodian of the child, and that Haidon had the requisite *mens rea*. A

reasonable jury therefore also could have concluded that the misstatements and omissions in

Danaher's affidavit were necessary to secure the warrant for Haidon's arrest, overcoming the

presumption that probable cause supported her arrest.

> b.   Malice

Next, Danaher argues that no reasonable jury could have concluded that Danaher acted

with malice, an element of Haidon's malicious prosecution claim. *See* Doc. No. 262, at 41. In

support of that argument, Danaher briefly reiterates many of the same arguments that he made

regarding the existence of probable cause, and states that "[t]here is no record evidence of ill

intent or motive." *Id*. However, malice does not require proof of ill intent or motive. It may be

satisfied by a showing that the prosecution was undertaken "in reckless disregard of the rights of the plaintiff." *Manganiello v. City of New York*, 612 F.3d 149, 163 (2d Cir. 2010) (quoting *Pinsky v. Duncan*, 79 F.3d 306, 313 (2d Cir. 1996)). And, a lack of probable cause, while not determinative, does creates an inference of malice. *See Lowth v. Town of Cheektowaga*, 82 F.3d 563, 573 (2d Cir. 1996).

In this case, the undisputed evidence supports a lack of probable cause, as described above. Additionally, Danaher spent a very short amount of time investigating Couloute's complaint before filing an application for an arrest warrant, leading the jury to conclude that Danaher did not conduct a thorough, fair investigation into Couloute's complaint. *See* Special Interrogatories, Doc. No. 222, at ¶ 1. For example, Danaher did not call Haidon back after she sent him multiple emails and other documents, and he did not reach out to the Connecticut or New York courts to corroborate information that both Haidon and Danaher had told him about court orders that had allegedly been issued in each state affecting their custodial rights. *See* Opp'n, Doc. No. 258-10, at 27-30. The jury apparently credited the evidence regarding those investigatory failures. *See* Special Interrogatories, Doc. No. 233, at ¶¶ 2-3 (answering "no" to questions about whether Danaher "appropriately follow[ed] up with both Ms. Haidon and Mr. Couloute" and "confirm[ed] the accuracy of statements made by both parties by seeking readily available independent information."). Those findings support an inference that Danaher acted with at least reckless disregard for Haidon's rights. Therefore, Danaher has not met his burden under Rule 50 to demonstrate a "complete absence of evidence" supporting the jury's conclusion that Danaher acted with malice.

2.  *Qualified Immunity*

Danaher also argues that he is entitled to judgment in his favor as a matter of law on qualified immunity grounds. *See* Doc. No. 260, at 2. "Qualified immunity protects officials from damages liability if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known," or, when a clearly established right was violated, if it "was objectively reasonable for [the officer] to believe that their acts did not violate those rights." *Zellner v. Summerlin*, 494 F.3d 344, 367 (2d Cir. 2007). Danaher's qualified immunity defense, even if proven, can only afford him judgment as a matter of law on Haidon's malicious prosecution claim and not her false arrest claim, which was brought under state law. *See Cuba-Diaz v. Town of Windham*, 274 F. Supp. 2d 221, 230 n.9 (D. Conn. 2003) ("Federal qualified immunity only extends to federal causes of action, not state claims.").

The question of whether Danaher is entitled to qualified immunity is a legal question that I must decide. *See, e.g., Zellner v. Summerlin*, 494 F.3d at 367 ("The ultimate question of whether it was objectively reasonable for the officer to believe that his conduct did not violate a clearly established right, i.e., whether officers of reasonable competence could disagree as to the lawfulness of such conduct, is to be decided by the court."). However, the question of whether a defendant officer's conduct was objectively reasonable is a mixed question of law and fact. *See, e.g., Kerman v. City of New York*, 374 F.3d 93, 109 (2d Cir. 2004); *Lennon v. Miller*, 66 F.3d 416, 420–21 (2d Cir. 1995)*; Warren v. Dwyer*, 906 F.2d 70, 76 (2d Cir. 1990).

On a post-trial motion for judgment as a matter of law, I am not permitted to make factual findings relevant to Danaher's qualified immunity defense that conflict with the jury's findings. It was the jury's job to determine at trial what facts were supported by a preponderance of the evidence. *See Kerman*, 374 F.3d at 109 ("Although a conclusion that the defendant official's conduct was objectively reasonable as a matter of law may be appropriate where there is no

16

dispute as to the material historical facts, . . .  if there is such a dispute, the factual questions must

be resolved by the factfinder.") (cleaned up). Because qualified immunity is an affirmative

defense, "it [was] incumbent upon the defendant to plead, and adequately develop, a qualified

immunity defense during pretrial proceedings" and to request that the jury be asked the questions

pertinent to any finding of fact essential to the court's determination of qualified immunity.

*Blissett v. Coughlin,* 66 F.3d 531, 538 (2d Cir. 1995). "If the defendant does not make such a

request, he is not entitled to have the court, in lieu of the jury, make the needed factual finding."

*Zellner,* 494 F.3d at 368.

On a motion for judgment as a matter of law, "it is the court's responsibility to determine,

based on undisputed facts or factual findings made by the jury, whether an officer's conduct was

objectively reasonable." *Dorceant v. Aquino*, 2018 WL 3869891, at *5 (E.D.N.Y. Aug. 15,

2018). When determining whether Danaher's conduct was objective reasonably I must "limit

[my] consideration to factual propositions that the jury in this case accepted or would have been

compelled to accept." *Kerman*, 374 F.3d at 114; *see also Zellner,* 494 F.3d at 370-71 ("[A] court

may grant a motion for judgment as a matter of law only if it can conclude that, with credibility

assessments made against the moving party and all inferences drawn against the moving party, a

reasonable juror would have been compelled to accept the view of the moving party.") (quoting

*Piesco v. Koch*, 12 F.3d 332, 343 (2d Cir. 1993)). In other words, the strict Rule 50 standard

applies to my review of the factual determinations made by the jury that are relevant to qualified

immunity. I may not find as a fact any proposition that is contrary to a finding made by the jury,

and on factual questions not submitted to the jury, I must view the evidence in the light most

favorable to Haidon. *See, e.g., Kerman*, 374 F.3d at 120; *Zellner*, 494 F.3d at 371.

Danaher argues that he is entitled to qualified immunity on three separate grounds: (1) because his actions did not violate a clearly established right, (2) because arguable probable existed for Haidon's arrest, and (3) because he was merely following his supervisor's lawful instructions. I will discuss each of those claims of qualified immunity in turn. For the reasons that I will describe, each of those three theories fails, and therefore Danaher is not entitled to judgment as a matter of law on qualified immunity grounds.

a.   Violation of a Clearly Established Right

First, Danaher violated Haidon's clearly established constitutional right not to be arrested or prosecuted without probable cause. Danaher's violation of a constitutional right was decided as a matter of fact by the jury's verdict. *See* Verdict Form, Doc. No. 220, at ¶ 1 (answering "yes" to the question whether "you find, by a preponderance of the evidence, that the defendant, while acting under color of state law, maliciously prosecuted Ms. Haidon in violation of her Fourth Amendment Constitutional rights?"). The right that he violated was also clearly established.

"The right not to be arrested or prosecuted without probable cause has, of course, long been a clearly established constitutional right." *Golino v. City of New Haven*, 950 F.2d 864, 870 (2d Cir. 1991). *See also Ricciuti v. NYC Transit Authority*, 124 F.3d 123, 128 (2d Cir. 1997) ("The right to be free from arrest or prosecution in the absence of probable cause is a long established constitutional right."). There can also be no doubt that a reasonable person, especially a reasonable police officer, would understand that a person cannot be prosecuted for a crime without probable cause. In fact, Danaher himself testified at trial that police officers, including himself, are trained about the probable cause standard. *See* Trial Tr., Doc. No. 245, at 509:8-25.

But, as Danaher points out in his briefing, to defeat qualified immunity an officer must have been on notice that his actions would violate the Constitution in the *particular*

circumstances he confronted. *See* Reply, Doc. No. 260, at 3-4. As the Second Circuit explains, "to be clearly established, a right must have been recognized in a particularized rather than a general sense." *Sira v. Morton*, 380 F.3d 57, 81 (2d Cir. 2004). In the case of an arrest without probable cause, the requirement of specificity means that the law defining what constitutes probable cause for the charged crime must also be clear. The Supreme Court explains:

> Given its imprecise nature, officers will often find it difficult to know how the general standard of probable cause applies in the precise situation encountered. Thus, we have stressed the need to identify a case where an officer acting under similar circumstances was held to have violated the Fourth Amendment. While there does not have to be a case directly on point, existing precedent must place the lawfulness of the particular arrest beyond debate.

*D.C. v. Wesby*, 583 U.S. 48, 64 (2018) (cleaned up). Only if the specific contours of the probable cause standard are well-defined can it be "clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001).

As explained previously, there are only two elements of the crime of Custodial Interference that the parties disagree were supported by probable cause: (1) whether Haidon took the child to New York and kept her from Couloute "knowing that [s]he ha[d] no legal right to do so," or in other words whether she had the requisite *mens rea* for the crime, and (2) whether Couloute was a "lawful custodian" of the child. *See* Conn. Gen. Stat. § 53a-98(a)(3).

Danaher argues that the law did not clearly establish that his conduct would violate the Constitution because the legal standard governing probable cause for the crime of custodial interference was unclear. For support, he contends that it was unclear as a matter of law whether the Erie County Order suspending Couloute's access to the child also suspended Couloute's right to custody of the child. *See* Reply, Doc. No. 260, at 3-5. He states that there must have been a "binding case that would put [him] on notice that Couloute did not have a right to physical

19

custody of [the child]." *Id.* But that argument focuses only on one element of the charged crime: Danaher's status as a lawful custodian.[4]

Even if it was unclear, under the circumstances Danaher was presented with, whether Couloute was a lawful custodian, the law was sufficiently clear regarding the applicable *mens rea* standard. The Connecticut Supreme Court, when it decided for the first time that a joint custodian could be liable for custodial interference for withholding a child from their other joint custodian, responded to concerns about the statute's applicability in situations involving abuse by explaining that:

---

[4] In addition to that primary argument, at oral argument Danaher's counsel, for the first time, argued that Danaher also is shielded by qualified immunity because he was entitled to rely only on the statements of the complainant, Couloute, for his determination of probable cause, and his further investigation that uncovered facts that undermined the existence of probable cause cannot be "held against him." For support, Danaher's counsel cited to *Singer v. Fulton Cnty. Sheriff*, which explained that "an arresting officer advised of a crime by a person who claims to be the victim . . . has probable cause to effect an arrest absent circumstances that raise doubts as to the victim's veracity," 63 F.3d 110, 119 (2d Cir. 1995), and *Sentementes v. Quinn*, which explained that "[t]he Second Circuit has held that '[t]he extent to which a police officer investigates a complainant's allegations before applying for an arrest warrant is a matter of discretion' for which he may be afforded qualified immunity." 2022 WL 2834607, at *7 (D. Conn. July 20, 2022) (quoting *Kafafian v. Young*, 477 F. App'x 762, 763-64 (2d Cir. 2012)). But those cases only stand for the proposition that officers can rely on the statements of an eyewitness or victim for their determination of probable cause, and are not required to investigate further. Even if further investigation would have uncovered exculpatory evidence, officers may nonetheless be entitled to qualified immunity if their actions were objectively reasonable.

Those cases say nothing of the situation where an officer *does* conduct further investigation that uncovers exculpatory evidence, and then misstates or omits that information from their arrest warrant affidavit. In fact, in *Sentementes*, the plaintiff alleged that the arrest warrant affidavit contained false statements, but the court found both that it did not, and that even if the challenged statements were incorrect, they were immaterial to the finding of probable cause. Therefore, those cases do not support the contention that Danaher is entitled to qualified immunity because, despite speaking with Haidon and obtaining documentation that undermined the existence of probable cause, he would have, at an earlier point in his investigation, been entitled to rely only on Couloute's statements to determine that probable cause existed. If the doctrine of qualified immunity were read that broadly, it would shield even the most egregious police conduct from liability because, ignoring all known evidence to the contrary and listening only to the facts as recounted by the complainant, probable cause would have existed.

> a parent who temporarily 'abducts' a child in an effort to safeguard that child from an
> abusive situation, but seeks appropriate legal redress under [the UCCJEA] as soon as is
> feasible under the circumstances, could not meet the necessary *mens rea* for custodial
> interference because he or she would have the legal right to take the child to protect him
> or her. We are confident that our law enforcement authorities and our courts will be
> sensitive to this reality.

*State v. Vakilzaden*, 251 Conn. 656, 663 n.8 (1999).

The circumstances Officer Danaher confronted were, essentially, as follows. Couloute

arrived at Danaher's office on the evening of January 11, 2017, complaining that Haidon took

their child to New York and refused to return the child to him. He complained that Haidon's

actions violated the child custody provision of their separation agreement that prevented either

party from removing the child from Connecticut without the written approval of the other. *See*

Case/Incident Report, Trial Ex. 2, at ¶¶ 1-4. But, as Danaher implicitly acknowledges in his

briefing, Couloute had at an earlier point given prior written permission for Haidon to move to

Buffalo, as evidenced by Couloute's email to Haidon saying "you're going to Buffalo, go." *See*

Doc. No. 262, at 44-45. Haidon sent a copy of that email, in addition to others, to Danaher on the

same evening Couloute made his initial complaint. *See* Trial Ex. 2, at ¶ 7. Danaher explains that

he concluded that probable cause nonetheless existed to arrest Haidon for custodial interference

because, even if Couloute gave his permission at one point, that permission was withdrawn by a

January 3, 2017 email from Couloute to Haidon demanding the child's return to Connecticut. *See*

Doc. No. 262, at 44-45; Trial Ex. 2, at 44, 56.

But before he wrote his affidavit, Danaher also spoke on the phone with Haidon, and

Haidon informed Danaher that she had relocated to New York to "protect her daughter," because

of a "history of abuse." Case/Incident Report, Trial Ex. 2, at ¶ 6. She also told Danaher that she

"believes Couloute wants to kill her." *Id.* Additionally, Couloute had also told Danaher that

Haidon obtained a custody order from a New York court. *See id.* at ¶ 4. A copy of that order—

the Erie County Order—was included in Danaher's investigative file. *Id*. at 32. The order was issued in response to a petition filed by Haidon under the Uniform Child Custody Jurisdiction and Enforcement Act (UCCJEA), asking for the Erie County Court to exercise temporary emergency jurisdiction over her custody dispute and issue an order of protection against Couloute. *See* Trial Ex. 56. The UCCJEA, adopted in both Connecticut and New York, *see* Conn. Gen. Stat. § 46b-115 *et seq*., N.Y. Dom. Rel. Law Art. 5-A, permits a court to exercise jurisdiction over child custody proceedings in precisely that type of situation. The Erie County Order is dated January 9th, less than a week after Couloute's January 3rd email, and clearly states that "[t]he father's access with the child [] is temporarily suspended." *Id*.

The situation Danaher confronted was therefore exactly what the Connecticut Supreme Court described in *Vakilzaden*: Haidon had temporarily "abducted" her child to safeguard the child from abuse and sought redress under the UCCJEA. *See* 251 Conn. at 663 n.8. If anything, Haidon had taken far less drastic action than described in *Vakilzaden*. She lawfully was in physical custody of the child and began withholding the child from Couloute when she became concerned about the child's safety. She did not "abduct" the child in the literal sense of the term. Nonetheless, *Vakilzaden* clearly and unequivocally states that a parent in Haidon's circumstance has the legal right to withhold the child and therefore "could not meet the necessary *mens rea* for custodial interference." *Id.* Thus, contrary to Danaher's argument, existing precedent did "squarely govern[] the specific facts at issue." *See* Reply, Doc. No. 260, at 4 (quoting *Kisela v. Hughes*, 584 U.S. 100, 104 (2018)). The law clearly established that, under the circumstances Officer Danaher confronted, there was an absence of probable cause for Haidon's arrest for custodial interference because she lacked the requisite *mens rea*.

b.  Objective Reasonableness: Arguable Probable Cause

Having determined that Danaher violated clearly established law, he may still be entitled to qualified immunity if his actions were objectively reasonable. A defendant is "entitled to qualified immunity from a suit for damages on a claim for arrest without probable cause if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." *Golino*, 950 F.2d at 870. The Second Circuit has repeatedly referred to that standard as the "arguable probable cause" standard, and elaborated that "arguable probable cause exists when 'a reasonable police officer in the same circumstances and possessing the same knowledge as the officer in question could have reasonably believed that probable cause existed in the light of well established law.'" *Zellner,* 494 F.3d at 369 (quoting *Lee v. Sandberg*, 136 F.3d 94, 102 (2d Cir. 1997)).

While *arguable* probable cause may be a lesser standard than *actual* probable cause, *see Zellner*, 494 F.3d at 370, the Second Circuit cautions that "[a]rguable probable cause must not be misunderstood to mean 'almost' probable cause." *Jenkins v. City of New York*, 478 F.3d 76, 87 (2d Cir. 2007). "[P]robable cause remains the relevant standard. If officers of reasonable competence would have to agree that the information possessed by the officer at the time of arrest did not add up to probable cause, the fact that it came close does not immunize the officer." *Id*.

As explained previously, when deciding whether arguable probable cause existed, I am bound by the jury's determination of the facts. "Once the jury has resolved any disputed facts that are material to the qualified immunity issue, the ultimate determination of whether the officer's conduct was objectively reasonable is to be made by the court." *Zellner,* 494 F.3d at 368. The factual question that the jury must resolve is "what the facts were that the officer faced

or perceived," and the court must then "make the ultimate legal determination of whether

qualified immunity attaches on those facts." *Stephenson v. Doe*, 332 F.3d 68, 81 (2d Cir. 2003)

(quoting *Warren*, 906 F.2d at 77).

The focus of Danaher's argument regarding arguable probable cause is the same alleged

legal ambiguity he argued precluded a finding that the law he violated was "clearly established."

He argues that because the legal effect of the Erie County Order on Couloute's custodial status

was unclear, reasonable officers could have disagreed about whether probable cause existed.[5]

*See* Doc. No. 262, at 45 (pointing to my statement on the record, in response to the jury's

question about whether the Erie County Order suspended Couloute's status as a lawful custodian,

that "there is essentially no guidance."). Again, Danaher's reliance on the lack of clarity of the

effect of the Erie County Order is insufficient to sustain arguable probable cause because

---

[5] Danaher argues that there was arguable probable cause for custodial interference "whether in
the first or second degree" and "under both subsections 1 and 3 of the statute." *See* Doc. No. 262,
at 44. In breaking down his argument in that way, Danaher is confusing the issues.

First, Haidon was arrested for custodial interference in the first degree, a felony, and it
has never been contended that there was probable cause to, alternatively, arrest her for custodial
interference in the second degree. The statute defining custodial interference in the second
degree is only relevant because it is referenced in the statute defining the first degree of the same
crime. *See* Conn. Gen. Stat. § 53a-97 ("(a) A person is guilty of custodial interference in the first
degree when he commits custodial interference in the second degree as provided in section 53a-
98 . . . (2) by taking, enticing or detaining the child or person out of this state.").

Additionally, by referencing "subsections 1 and 3 of the statute", Danaher is presumably
referring to Conn. Gen. Stat. § 53a-98, which sets forth three ways in which a person can be
liable for custodial interference in the second degree: (1) by taking or enticing a child from his
lawful custodial; (2) by taking or enticing an incompetent person from the custody of another
person or institution; or (3) by keeping or otherwise refusing to return a child under 16 years of
age from their lawful custodian after a request by such custodian for the return of the child.
Based on the evidence presented at trial, there is no disputing that the child was in the care of
Haidon at all relevant periods of time, and Haidon did not therefore "take" the child from
Couloute. The jury also answered "no" in response to a special interrogatory asking whether
Haidon "took" the child from Couloute. *See* Doc. No. 224, at ¶ 7. Therefore, the only possibly
applicable subsection is the third.

reasonable officers could not disagree, in light of well-established law, that Haidon lacked the requisite *mens rea* for the crime of custodial interference.

Prior to Couloute's January 3rd email requesting the return of the child, it was objectively unreasonable to determine that Haidon had the requisite *mens rea* because Couloute had given Haidon permission to relocate with the child to New York. In response to an interrogatory asking whether Danaher "reasonably believe[d] that Mr. Couloute had not given prior written permission for Ms. Haidon to move to Buffalo, New York with the child" the jury answered "No." *See* Special Interrogatories, Doc. No. 222, at ¶ 4. I am bound by the jury's determination of the factual element of that question—that, at the time he applied for a warrant for Haidon's arrest, Danaher was aware of written permission that Couloute had given to Haidon for her to relocate with the child to New York. The only evidence admitted at trial that the jury could have considered to be that written permission was the "you're going to Buffalo, go" email Couloute sent on October 14, 2016. *See* Trial Ex. 2, at 56. And, the Separation Agreement between Couloute and Haidon only prevents Haidon from taking the child out of the state of Connecticut *without* the written permission of Couloute. Trial Ex. 22, at ¶ 6. Therefore, at least for some period after October 14, 2016, but before January 3, 2017, no reasonable officer would have concluded that probable cause existed to arrest Haidon for custodial interference.

After January 3, 2017, and until he sought a warrant for her arrest on January 12, 2017, Danaher's theory is that at least *arguable* probable cause existed to arrest Haidon for custodial interference because Couloute had revoked any plausible permission he had given Haidon to move to New York with the child. *See* Doc. No. 262, at 45. Notably, nothing in the Separation Agreement says that either parent must bring the child back to the state of Connecticut if permission to move out of state is given and then revoked. *See* Separation Agreement, Trial Ex.

25

22. Additionally, Danaher maintains his position despite the Erie County Order suspending Couloute's access to the child on January 9, 2017, because the effect of that order was unclear. *Id.* But the legal effect of that order on Couloute's custodial status, even if unclear, was irrelevant to whether Haidon could rely on the order when deciding whether she was obligated to return the child to Couloute. Haidon had no reason to doubt the validity of the Erie County Order. The plain terms of that order expressly *prohibited* Haidon from giving Couloute access to the child, regardless of Couloute's custodial status. *See* Trial Ex. 5 (ordering that "the father's access with the child [] is temporarily suspended pending further order of the Court."). The terms of that order therefore defeat any belief Danaher had regarding Haidon's *mens rea*.

Indeed, I am bound by the jury's determination, as a factual matter, that Danaher could not reasonably have believed Haidon had the requisite *mens rea*. *See* Special Interrogatories, Doc. No. 222, at ¶¶ 9-10 (answering "no" to the questions whether Danaher "reasonably believe[d] that, prior to January 12, 2017, Ms. Haidon knew she had no legal right to take [the child] to Buffalo, New York" and "knew she had no legal right to refuse to return [the child] to Connecticut."). Moreover, as a matter of law I conclude that it would have been abundantly clear to any reasonable officer that the Erie County Order undermined the existence of probable cause because it negated Haidon's *mens rea*. The circumstances surrounding the order support the conclusion that Haidon believed she had a legal right to move with the child to New York and, at some point at least as early as January 2017, to keep the child from Couloute.[6]

---

[6] Danaher also argues that, even if the Erie County Order did give Haidon the right to withhold the child from Couloute, Danaher only "requested that the child be presented to the Bloomfield Police Station," and Haidon "was not prevented [by the Erie County Order] from turning the child over to Connecticut authorities." Doc. No. 262, at 24, 46. But the crime of custodial interference requires that a person refuse to return a child "to such child's lawful custodian," Conn. Gen. Stat. § 53a-98(a)(3), and therefore a refusal to turn a child over to a police officer could never make out probable cause for custodial interference.

This case is not one in which a police officer credited one witness' report over another, or relied on mistaken information from a credible witness, and thus "reasonably but mistakenly conclude[d] that probable cause [was] present." *Anderson v. Creighton*, 483 U.S. 635, 641 (1987). Couloute did not dispute the existence of the Erie County Order or its basis. *See* Trial Ex. 2, at ¶ 4. Moreover, regardless of the ultimate disposition of Haidon's underlying custody and family offense petitions—which was undeniably influenced by Haidon's intervening arrest in Connecticut—the Erie County Family Court did credit Haidon's allegations of abuse and take temporary emergency jurisdiction over her petitions. *See* Trial Exs. 56-57. Any reasonable officer would have been compelled to conclude that Haidon was following the law as set forth procedurally under the UCCJEA: intending to protect her child from harm, she moved to a safe place, and then, within a reasonable period of time, petitioned for emergency jurisdiction in the local court so that it could issue orders protecting herself and her child. As I stated previously, the Connecticut Supreme Court's explanation in *State v. Vakilzaden* that a parent who follows the UCCJEA procedure cannot meet the *mens rea* for custodial interference is squarely applicable to this case. *See* 251 Conn. at 663 n.8. Therefore, no reasonable officer could have determined that Haidon had the necessary *mens rea*—knowledge that she had legal right to move to New York and to keep her child from Couloute. On that basis it is impossible to conclude that arguable probable cause existed because an essential element of the offense could not be satisfied as a matter of law.

In conclusion, based on the information that the jury determined was known to Danaher at the time he wrote the arrest warrant affidavit, officers of reasonable competence could not have concluded that Haidon *knew she had no legal right* to keep the child in New York, and it

thus was objectively unreasonable to conclude that probable cause existed to arrest Haidon for custodial interference.

  c. Supervisor's Lawful Instruction

  Finally, Danaher argues that he is entitled to qualified immunity because he sought an arrest warrant in response to his supervisor, Sergeant Klomberg, instructing him to do so. *See* Doc. No. 262, at 48-49. "Plausible instructions from a superior or fellow officer support qualified immunity where, viewed objectively in light of the surrounding circumstances, they could lead a reasonable officer to conclude that the necessary legal justification for his actions exists." *Anthony v. City of New York*, 339 F.3d 129, 138 (2d Cir. 2003) (quoting *Bilida v. McCleod*, 211 F.3d 166, 174–75 (1st Cir. 2000)). But, reliance on "plausible instructions" from a supervisor can only be a basis for qualified immunity when an officer has no independent knowledge of the factual basis for the instruction he is given, and no reason to doubt the legality of the instruction. *See Vasquez v. Maloney*, 990 F.3d 232, 241-42 (2d Cir. 2021) (citing *Diamondstone v. Macaluso*, 148 F.3d 113, 117-18, 126 (2d Cir. 1998)). However, Danaher's argument that he is entitled to qualified immunity on the basis of Klomberg's plausible instructions fails for a more basic reason: the jury found that Klomberg did not instruct Danaher to submit the arrest warrant affidavit. *See* Special Interrogatories, Doc. No. 222, at ¶ 11 (answering "no" to the question "did a superior officer instruct Officer Danaher to submit the arrest warrant application?"). That factual finding is supported by the evidence. Klomberg testified that he simply signed off on Danaher's already-drafted arrest warrant affidavit on the basis of his confidence in Danaher's honesty and work ethic, without even reviewing the investigative file himself. Trial Tr., Doc. No. 245, at 562:4-564:11. The jury's finding cannot be rejected. *See Kerman*, 374 F.3d at 114 (on a motion for judgment as a matter of law, a court must "limit its consideration to factual

28

propositions that the jury in this case accepted or would have been compelled to accept.").

Therefore, Danaher is not entitled to qualified immunity on the basis of reliance on "plausible

instructions" from a supervisor.

B.  <u>Motion for a New Trial</u>

Next, Danaher moves for a new trial on various grounds. First, Danaher makes a one-

sentence argument that the verdict is "contrary to the clear weight of the evidence." Doc. No.

262, at 50. Despite that the standard for granting a new trial under Rule 59 is less stringent than

the Rule 50 standard for judgment as a matter of law, the weight of the evidence presented at

trial clearly supports the jury's verdict for the same reasons as described above. Therefore,

Danaher's motion for a new trial on that basis is denied.

Danaher asserts three other bases for his motion for a new trial: (1) errors in the jury

instruction; (2) errors in evidentiary rulings; and (3) jury prejudice as a result of attorney

misconduct. I will address each of those arguments in turn.

1.  *Errors in Jury Instructions*

A Rule 59 motion for a new trial on the basis of an erroneous jury instruction should be

granted if an instruction was erroneous, unless the error was harmless. *See Velez v. City of New*

*York*, 730 F.3d 128, 134 (2d Cir.2013). "An error is harmless only when [the court is] persuaded

it did not influence the jury's verdict." *Townsend v. Benjamin Enter., Inc.*, 679 F.3d 41, 56 (2d

Cir. 2012).

Danaher contends that the Court erred in instructing the jury that the Erie County Order

was valid, and that Couloute was not a lawful custodian of the child during the time in which the

Erie County Order was in effect. *See* Doc. No. 262, at 51-55. The Erie County Order, which was

entered into evidence at trial as Exhibit 5, was issued on January 9, 2017 and states: "the father's

29

access with the child [] is temporarily suspended pending further order of the Court." During the

trial, I determined as a matter of law that the Erie County Family Court had jurisdiction to issue

its order, and therefore instructed the jury that it was a valid and enforceable court order. *See*

Order, Doc. No. 204; Jury Instructions, Doc. No. 219, at 14-15. Then, during deliberations, the

jury asked a question about the effect of the order. The following is the question that the jury

asked, and my answer:

> Question: Does the Erie court order restricting access to [the child] remove Couloute's right as a lawful custodian of [the child]?

> Answer: The Erie court order had the effect of suspending Couloute's right to custody of [the child] but only during the period the order was in effect.

Trial Tr., Doc. No. 252, at 1608:17-23. As explained above, my instructions on the validity and

effect of the Erie County Order was relevant to the determination of whether probable cause

existed for Haidon's arrest because an element of the crime of Custodial Interference is whether

the person to be charged "refuses to return a child who is less than sixteen years old *to such*

*child's lawful custodian*." Conn. Gen. Stat. § 53a-98 (emphasis added).

First, my instruction that the Erie County Order was valid and enforceable was not

erroneous. As stated in my written Order issued on December 8, 2023, *see* doc. no. 204, trial

exhibits that had not previously been provided to the Court—in particular, Haidon's UCCJEA

petition and family offense petition to the Erie County Family Court, *see* trial exs. 56-57—

allowed me to determine the basis for the Erie County Family Court's jurisdiction. *See* Doc. No.

204, at 2. I concluded that the Erie County Family Court had temporary emergency jurisdiction

under the UCCJEA, N.Y. Dom. Rel. Law § 76-c, because of the allegations of abuse and neglect

made in both the plaintiff's UCCJEA petition and the plaintiff's Family Offense Petition. *See*

Doc. No. 204, at 4. Though not admitted as evidence at trial, the transcript of a February 28,

2017 jurisdictional conference between the Erie County Family Court and Hartford Superior

Court Judge José A. Suarez, the Judge presiding over the ongoing Connecticut custody case

between Haidon and Couloute, confirms my conclusion that the Erie County Family Court had

temporary emergency jurisdiction. At that conference, Judge Suarez stated that, although the

Connecticut Court retains jurisdiction over the child under the UCCJEA,

> [t]here is, however, a provision under the [UCCJEA] that allows a foreign court, in this
> case it would be you in New York, to issue orders of an emergency nature if you
> determine, based on the facts that occur in your presence, that there is an emergency, and
> then certainly you can have jurisdiction for that purpose. I think that under the [UCCJEA]
> we here in Connecticut would if you choose to emergency orders we would suspend our
> custody orders until you've reached the solution in your state.

Doc. No. 176-1, at 8:18-9:2. Judge Suarez then did, in fact, agree to suspend the Connecticut

Court's jurisdiction so that an investigation could be conducted in New York under the

jurisdiction of the Erie County Family Court. *Id.* at 12:2-6 ("I think the proper thing to do at this

time is for this Court [to] just suspend its jurisdiction so that the neglect investigation could be

conducted in New York. THE COURT (NY): And I concur with that.").

Next, Danaher argues that my instruction on the effect of the Erie County Order on

Couloute's custodial status was incorrect because it suspended only Couloute's *access* to the

child, not his status as a lawful custodian, because Connecticut law distinguishes between

custody and access to a child. *See* Doc. No. 262, at 51 (citing Conn. Gen. Stat. § 46b-56). I did

state on the record that there is "essentially no guidance" on whether, for purposes of the

custodial interference statute, there is a distinction between physical access to a child and lawful

custody. Trial Tr., Doc. No. 252, at 1601:19-23. Arguing that there is no relevant distinction

between custody and access, Haidon cites to a Connecticut case *Zamstein v. Marvasti,* 1994 WL

692631, at *5 (Conn. Super. Ct. Nov. 29, 1994), *aff'd,* 240 Conn. 549 (1997). *See* Doc. No. 258-

10, at 52-53. That decision held that a mother could not be found liable for the tort of custodial

interference, which mirrors the criminal custodial interference statute, for withholding her children from their father, because a restraining order was in effect that barred the father from having unsupervised access to the children. *Zamstein*, 1994 WL 692631 at *5*. But that case says nothing about the restraining order's effect on the father's custodial status, instead finding the restraining order relevant because it negates the causal link between the mother's actions and the deprivation of the father's access to his children. *Id.*

No Connecticut caselaw or other authority defines the term "lawful custodian" for purposes of the custodial interference statute. However, my interpretation of the term—that it requires physical access, in addition to legal custody—is consistent with the custodial interference statute. "The crime of custodial interference was designed to protect any custodian from deprivation of his or her custody rights." *State v. Vakilzaden*, 251 Conn. 656, 665 (1999). If the rights of a "lawful custodian" did not, by definition, necessarily include the right to physical access to the child, then another individual's taking or refusing to return the child to that custodian would not necessarily deprive the custodian of any rights. Therefore, the only interpretation that gives the statute any internal logic is that the term "lawful custodian," as used in Conn. Gen. Stat. § 53a-98, must be defined as something distinct from solely legal custody and must include the right to physical access to the child. Consistent with that conclusion, my instruction to the jury that the Erie County Order, which temporarily suspended Couloute's access to the child, also suspended Couloute's right to custody of the child while it was in effect was not erroneous.

Moreover, even if my instruction that Couloute was not a "lawful custodian" was erroneous, it was harmless. As described previously, the jury reasonably concluded that Haidon did not know she had no legal right to withhold the child from Couloute. *See* Special

Interrogatories, Doc. No. 222, at ¶¶ 9-10. The Erie County Order itself provides further evidentiary support for that conclusion, because, even if it did not affect Couloute's custodial status, it remains a valid court order and is evidence that Haidon believed she had a legal right to move to New York to ensure the safety of herself and her child. *See State v. Vakilzaden,* 251 Conn. at 663 n.8 ("[A] parent who temporarily 'abducts' a child in an effort to safeguard that child from an abusive situation, but seeks appropriate legal redress under [the UCCJEA] as soon as is feasible under the circumstances, could not meet the necessary *mens rea* for custodial interference."). Because the Custodial Interference statute requires that the charged individual take or withhold a child "knowing that [s]he has no legal right to do so," Conn. Gen. Stat. § 53a-98, that conclusion is an independent basis for determining that there was an absence of probable cause for Haidon's arrest. Therefore, even if my instruction about the effect of the Erie County Order was incorrect, it was not clearly prejudicial to the outcome of the trial, when considered in light of the evidence as a whole.

   2.  *Errors in Evidentiary Rulings*

   Next, Danaher argues that he is entitled to a new trial because "the Court erred in permitting plaintiff's counsel to read deposition transcripts into the record over defense counsel's objection." Doc. No. 262, at 56. Danaher does not point to specific instances in which Haidon's counsel was improperly permitted to read deposition testimony into evidence, instead complaining that "the manner of presentation of the defendant's deposition testimony, that of Sergeant Klomberg, and Mr. Jack Ryan," was "prejudicial to the defendant, and purposefully confusing to the jury" and "prevented defense counsel from objecting to inadmissible testimony." *See* Reply, Doc. No. 260, at 8-9. The vagueness of Danaher's argument is sufficient to defeat it.

As with any motion made under Rule 59, it is Danaher's burden, as the movant, to prove that any error in an evidentiary ruling was "clearly prejudicial to the outcome of trial." *Reinauer Transp. Companies*, 397 F.3d 120, 124 (2d Cir. 2005). *See also Williams v. Marinelli*, 2017 WL 11473740, at *14 (D. Conn. Feb. 8, 2017) ("[T]o obtain a new trial on the ground of erroneous evidentiary rulings, 'a litigant must do more than merely voice a disagreement with the court's evidentiary rulings. Rather, a motion for new trial on the basis of improper evidentiary rulings will be granted only where the improper ruling affects a substantial right of the moving party.'") (quoting *Litras v. Long Island R.R.*, 2006 WL 1455466, at *11 (E.D.N.Y. May 23, 2006)). At trial, Haidon's counsel repeatedly read small excerpts of the deposition testimony of various witnesses into the record for impeachment purposes. That use of deposition testimony, even if it sometimes resulted in lengthy and repetitive lines of questioning, is permitted under Federal Rule of Civil Procedure 32(a)(2), which allows "[a]ny party [to] use a deposition to contradict or impeach the testimony given by the deponent as a witness, or for any other purpose allowed by the Federal Rules of Evidence." Fed. R. Civ. P. 32(a)(2). Danaher has therefore not identified any erroneous evidentiary rulings, let alone met his burden to prove that one or more evidentiary errors were prejudicial to the outcome of trial. If anything, as I stated to counsel on the record during trial, Haidon's counsel's manner of questioning witnesses, including but not limited to their use of deposition testimony, risked prejudicing the jury *against* Haidon. *See, e.g.,* Trial Tr., Doc. No. 244, at 170:2-6 ("We're being very repetitive. . . . So you're going to lose the jury, frankly, if you are going over and over and over issues.").

3. *Attorney Misconduct*

Danaher also argues that a new trial should be granted because Haidon's counsel improperly appealed to juror sympathy, had improper contact with jurors, interrupted defense

counsel during her opening and closing statements, and made incorrect statements of law to the

jury during his closing argument. Doc. No. 262, at 56. Danaher's references to alleged attorney

misconduct are scattered throughout the background section of his memorandum in support of

his motion. Most of his allegations of misconduct are frivolous. For example, he complains of

one expert witness smiling and saying goodbye to the jury on his way out of the courtroom, *id.* at

16, Haidon's attorney objecting once during his attorney's closing argument, *id.* at 25, and

Haidon's attorney apologizing to the jury about his "aggressive" cross-examination style. *Id.*[7]

None of those actions or statements amount to anything close to misconduct.

Danaher's argument that Haidon's counsel appealed to juror sympathy presents a closer

call. Danaher's counsel raised concerns about appeals to juror sympathy at several points during

trial. In some instances, Danaher's counsel raised concerns about testimony—especially

testimony that was offered to prove Haidon's emotional distress damages and testimony

regarding Haidon and Couloute's relationship history—that was inherently sympathetic and

unavoidably emotional, yet obviously relevant to the issues in the case. *See, e.g.,* Trial Tr., Doc.

No. 246, at 698:16-699:25 (Danaher's counsel expressing concern that Haidon was crying on the

stand); Trial Tr., Doc. No. 244, at 101:3-102:19 (Danaher's counsel objecting to questioning

about Haidon's prior domestic violence complaints, and my instruction that it was relevant to

Danaher's state of mind). Other times, I warned Haidon's counsel to avoid certain arguments that

I believed were irrelevant and therefore improper attempts to appeal to juror sympathy. For

example, I warned Haidon's counsel early on in the trial not to argue that Haidon lacked the

---

[7] Like several other arguments raised in his memorandum of law in support of his motion,
Danaher's arguments about attorney misconduct are not supported with a single citation to the
record. *See* Doc. No. 262, at 56. To make sense of his arguments, I have highlighted various
factual statements about the trial from the background section of his memorandum, which I
presume are examples of the "misconduct" he complains of.

*mens rea* for custodial interference because Couloute failed to pay child support and Haidon was unable to support herself and the child. *See, e.g.*, Trial Tr., Doc. No. 244, at 331:11-341:7. But throughout the trial, I believe that Haidon's counsel heeded those warnings, only sparingly making reference to Haidon's homelessness before she moved to Buffalo as narrative background. *See, e.g.*, Trial Tr., Doc. No., 252, at 1519:24-1520:3 ("It was this e-mail that Ms. Haidon told Officer Danaher gave her what she said was her right to take [the child] to Buffalo and move in with her parents temporarily and not be stuck on the curb of a Marriott hotel in Connecticut."). If that and other similar statements appealed to the jury's sympathy, that appeal was incidental and not prejudicial to the outcome of the trial. The subject matter of this case was, frankly, unavoidably sympathetic and emotional.

The burden to prove that opposing counsel's conduct was so prejudicial that it necessitates a new trial is a heavy one—a new trial should only be granted on that basis in rare cases. *Marcic v. Reinauer Transp. Companies*, 397 F.3d 120, 124 (2d Cir. 2005). Moreover, "where the jury's verdict finds substantial support in the evidence, counsel's improper statements will frequently be *de minimis* in the context of the entire trial." *Id*. As explained previously, the jury's verdict in this case is supported by substantial evidence. And, during my instructions to the jury after the close of evidence, I repeatedly warned the jury not to decide the case on the basis of sympathy. *See, e.g.*, Trial Tr., Doc. No. 251, at 1489:1-3. ("In reaching your verdict, you are not to be affected by sympathy for, or prejudice against, any of the parties."). Therefore, even if Haidon's counsel improperly sought to appeal to the jurors' sympathy, those appeals were *de minimus* and not prejudicial to the outcome of the trial.

C. Conditional Remittitur

Finally, Danaher moves for conditional remittitur as an alternative to a new trial, arguing that "the jury's award of 1.5 million in compensatory damages is grossly excessive." Doc. No. 262, at 49. "If a district court finds that a verdict is excessive, it may order a new trial, a new trial limited to damages, or, under the practice of remittitur, may condition a denial of a motion for a new trial on the plaintiff's accepting damages in a reduced amount." *Tingley Sys., Inc. v. Norse Sys., Inc.*, 49 F.3d 93, 96 (2d Cir. 1995). Remittitur may be appropriate if: (1) there was an "error that caused the jury to include in the verdict a quantifiable amount that should be stricken"; or if "the award is 'intrinsically excessive' in the sense of being greater than the amount a reasonable jury could have awarded." *Kirsch v. Fleet Street, Ltd.*, 148 F.3d 149, 165 (2d Cir. 1998) (quoting *Trademark Research Corp. v. Maxwell Online, Inc.*, 995 F.2d 326, 337 (2d Cir. 1993)). In this case, the jury determined that Haidon was entitled to $160,000 in economic damages and $1,340,000 in non-economic damages, for a total of $1,500,000. *See* Jury Verdict, Doc. No. 220, at ¶ 3. Danaher's arguments are, essentially, that the evidence admitted at trial did not support a finding of economic damages in the amount the jury awarded, and that the non-economic damages awarded are intrinsically excessive.

A motion for remittitur is brought under Rule 59(e), and therefore, in considering the motion, I may consider the weight of the evidence and need not view the evidence in the light most favorable to Haidon. *DLC Management Corp. v. Town of Hyde Park*, 163 F.3d 124, 133 (2d Cir. 1998). Applying that standard of review, I first agree that the evidence at trial did not support the jury's finding of $160,000 in economic damages. I instructed the jury that they could award damages for reasonable and necessary attorneys' fees and related expenses that Haidon was forced to expend or borrow for criminal and family court proceedings as a result of her arrest and prosecution. *See* Jury Instructions, Doc. No. 219, at 19. In his closing argument,

37

Haidon's counsel submitted to the jury that the total amount of economic damages incurred by Haidon was $160,000—the same amount that the jury ultimately awarded. *See* Trial Tr., Doc. No. 252, at 1549:1-5. But the documentary evidence admitted at trial—including copies of checks, bank statements, credit card statements, and billing records—reflects a total amount of identifiable expenses of about $87,500: approximately $77,000 of miscellaneous expenses paid by Haidon's father, Patrick Haidon, on behalf of his daughter related to her criminal defense and resulting custody lawsuit, and $10,500 paid directly to Haidon's criminal defense attorney, Rachel Baird. *See* Trial Exs. 75, 79-81, 111; Trial Tr., Doc. No. 248, at 1104:1-7. Though it is unclear how Haidon's attorney arrived at the precise $160,000 amount that he asked the jury to award as economic damages, Patrick Haidon testified at trial that he spent $275,000—an amount of money far exceeding $87,500—on his daughter's behalf as a result of her arrest. *See* Trial Tr., Doc. No. 247, at 1057:14-17 ("There is everything that we have done as far as, you know, courts, attorneys, doctors and expenses for housing and food and taking care of them, yes. That's $275,000."). But there was no evidence admitted at trial to prove what exactly that additional sum of money was spent on, and it was therefore impossible for the jury to determine that any sums expended above $87,500 were necessary and caused by Danaher's actions. Moreover, despite testimony from both Haidon and her father that they "expected" that she would repay her father expenses he paid on her behalf, there was no evidence of any explicit agreement about how much of the $275,000 Haidon would repay. *See* Trial Tr., Doc. No. 247, at 1061:4-6 ("[W]e expect it back, as any parent would. But it's based on what she's able to provide."). Therefore, while the jury was permitted to award economic damages representing debts incurred by Haidon that she is expected to repay, I conclude that any award above $87,500 was the result of speculation.

Next, Danaher argues that the jury's award of non-economic damages was intrinsically

excessive. He characterizes Haidon's pain and suffering as "limited to a relatively short span of

time," and "presented to the jury absent any evidence of medical or counseling services being

provided." Doc. No. 262, at 49-50. But, at trial, copious evidence was presented to the jury,

through Haidon's own testimony and through other witnesses, that established that the emotional

anguish Haidon experienced as a result of her arrest and her loss of custody of the child was

extreme is ongoing. *See, e.g.* Trial Tr., Doc. No. 246, at 682:19-682:21 ("[T]his has been

something that I have had to live through for seven years . . ."); Trial Tr., Doc. No. 247, at

875:14-21 ("It's like I just felt like the pieces of my mind, body, heart and soul were just

shattered like glass all over the floor. And that's how I felt. And I was trying so hard every day to

pick them up and put them back together but it just never ended. It's still going. It just doesn't

end, you know."). Additionally, expert witnesses testified about the profound psychological

effect of a mother's involuntary separation from their child. *See, e.g.,* Doc. No. 248, at 1019:6-11

(testimony of expert witness Dr. Neil Grossman that "[t]he loss of a child is devastating,

especially when you're very closely connected with child and when you fear that the child might

be subject to abuse herself. It's catastrophic. It's almost—it's difficult to find words to express

how traumatic it can feel.").

The weight of the evidence is therefore clear that Haidon's emotional pain and suffering

was extremely severe. Setting a precise dollar value for that suffering is obviously difficult. But,

measuring the value of a plaintiff's emotional distress is "a matter peculiarly within the province

of the trier of fact," in this case, the jury. *Mahon v. B.V. Unitron Mfg., Inc.*, 284 Conn. 645, 661

(2007). And, "[i]n the absence of a 'particular discernible error,' as a general matter the court

may not set aside the jury's award as excessive unless 'the award is so high as to shock the

judicial conscience and constitute a denial of justice.'" *Leo v. Long Island R.R. Co*., 307 F.R.D. 314, 321-22 (S.D.N.Y. 2015) (quoting *Kirsch*, 148 F.3d at 165). I am therefore left to determine whether an award of $1,340,000 in emotional distress damages is too high as a matter of law. A review of jury awards in similar cases can be helpful to that analysis. *Ismail v. Cohen*, 899 F.2d 183, 186 (2d Cir. 1990).

Within the Second Circuit, courts have remitted awards of emotional pain and suffering in excess of $1,000,000 in malicious prosecution cases to figures in the range of $350,000 to $500,000. *See Morse v. Fusto*, 2013 WL 4647603, at *28 (E.D.N.Y. Aug. 29, 2013) (collecting cases). The emotional distress damages that the jury awarded to Haidon in this case are more than double those figures. But there is reason why. Although "courts have found it useful to review awards in other cases involving similar injuries," they also must "bear[] in mind that any given judgment depends on a unique set of facts and circumstances." *Nairn v. Nat'l R.R. Passenger Corp*., 837 F.2d 565, 568 (2d Cir. 1988). Not only did Haidon suffer many of the symptoms typically described by plaintiffs in similar cases—such as sleeplessness, anxiety, and suicidal thoughts, *see, e.g., Morse*, 2013 WL 4647603, at *28—but those symptoms were exacerbated by her loss of custody of the child for a year and her witnessing the ongoing impact of that separation on the child. Moreover, Haidon did not just lose custody of the child to anyone, but to a man, Couloute, who she believed had sexually abused the child. *See* Trial Tr., Doc. No. 251, at 1329:21-133:3. The emotional distress suffered by Haidon, therefore, is "truly extraordinary and unique." *Morse*, 2013 WL 4647603, at *30*. Nonetheless, had the decision been mine, perhaps I would have awarded somewhat less noneconomic damages. But "[t]he fact that the jury returns a verdict in excess of what the trial judge would have awarded does not alone establish that the verdict was excessive." *Campbell v. Gould*, 194 Conn. 35, 41 (1984). On

account of the severity and duration of the harms suffered by Haidon, I cannot conclude that the

jury's award shocks the judicial conscience or falls outside the range of reasonable noneconomic

damages awards.

Therefore, I will grant a new trial on the issue of economic damages only, unless Haidon

agrees to a remittitur reducing her award of damages to $1,427,500: $87,500 of economic

damages, and $1,340,000 of noneconomic damages.

## IV.    Conclusion

For the reasons set forth above, Danaher's motion for judgment as a matter of law is

**denied**. Danaher's motion for a new trial on liability is **denied**. Danaher's motion for a new trial

on damages is **granted** with respect only to the economic damages award. I will grant a new trial

on the issue of economic damages only, unless **within 14 days** Haidon elects to accept a remitted

economic damages award of $87,500, for a total compensatory damages award of $1,427,500.

So ordered.

Dated at Bridgeport, Connecticut, this 29th day of August 2024.

/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge